IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILLIP ALLISON,

Plaintiff, No. CIV S-05-0547 GEB GGH P

vs.

DR. KHOURY, et al., ORDER and

Defendants. FINDINGS & RECOMMENDATIONS

_______________________________/

I. Introduction

Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court are three separate motions to dismiss filed on behalf of the defendants: 1) motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) filed December 22, 2005, on behalf of defendant Bien; 2) motion to dismiss pursuant to Fed. R. Civ.P. 12(b) and 12(b)(6) filed December 27, 2005, on behalf of defendants Khoury, Mehta, Liou and Kearny; and 3) motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) filed January 19, 2006, on behalf of defendant Raymond.

/////

/////

/////

II. Plaintiff's Claims

In order to put all three motions to dismiss in context, the court will summarize the allegations contained in plaintiff's June 17, 2005, amended complaint.

On November 5, 2003, plaintiff was taken from the California Medical Facility (CMF) to the Queen of the Valley Hospital (QVH) in Napa, California. At QVH, defendant Dr. Bien diagnosed plaintiff as having end-stage renal polycystic kidney disease and implanted a gore-tex dialysis shunt in plaintiff's upper left arm. Plaintiff returned to CMF the same day.

On December 19, 2003, plaintiff returned to QVH where defendant Raymond removed an obstructed blood clot in the shunt. Plaintiff returned to CMF the same day. On December 30, 2003, plaintiff's left hand became very swollen and numb. The CMF dialysis staff told plaintiff that this was normal.

On December 5, 2004, CMF dialysis staff found another blood clot in plaintiff's shunt. On February 6, 2004, plaintiff returned to QVH where defendant Bien removed the clot.

On February 21, 2004, plaintiff awoke in his bed to find dark blood coming out of the shunt. On February 22, 2004, plaintiff awoke to find blood draining from the shunt. Later that day, plaintiff went to the B-1 Clinic where a Medical Technical Assistant (MTA) examined the site. The MTA told plaintiff that there was nothing she could do for plaintiff. On February 22, 2004, plaintiff filed an A.D.A. Appeal regarding the failure of the medical staff to treat his wound.

On February 25, 2004, the dialysis doctor, Dr. Al-Mufti, examined the black knot on the site of plaintiff's shunt and directed that plaintiff be sent back to QVH as soon as possible. On February 26, 2004, plaintiff returned to QVH where defendant Bien removed some very dark blood from plaintiff's arm. Plaintiff was sent back to CMF the same day.

On February 27, 2004, plaintiff became very ill, suffering from chills and a fever. Plaintiff went to the prison emergency room, where a doctor told him that he had an infection in his kidneys. The doctor prescribed medication and returned plaintiff to his housing unit.

On February 28, 2004, plaintiff awoke to see blood running from the shunt. Plaintiff went to the B-1 medical clinic where staff told him that he had a fever. The shunt site was cleaned and plaintiff returned to his housing unit.

On February 29, 2004, plaintiff returned to the B-1 medical clinic because the shunt site was severely swollen and draining black blood. After examining plaintiff, Dr. Altchek called QVH and then ordered plaintiff to return to QVH on March 1, 2004. On the evening of February 29, 2004, Dr. Altchek examined plaintiff's shunt again and determined that it was severely infected.

On March 1, 2004, plaintiff returned to QVH. On March 2, 2004, surgery was performed on plaintiff. The surgical report stated, "The infected segment of the graft was exposed and it was noted to be sitting in a pool of infected granulated tissue." On February 8, 2004, plaintiff had another surgery for secondary closure of the two wounds. On March 11, 2004, plaintiff was discharged from QVH.

On March 23, 2004, plaintiff complained to a doctor at the B-1 medical clinic about swelling, numbness and pain in his left hand. The doctor told plaintiff that he had an obstruction on his left side that was causing the problems in his hand. On March 24, 2004, plaintiff showed his hand to Dr. Al-Mufti who told plaintiff to keep his hand elevated at all times.

On March 30, 2004, plaintiff's administrative appeal no. M-04-303 was reviewed and partially granted at the second level. The second level response stated, "The institution notes that the plaintiff's shunt complications were addressed by the CMF and Queen of the Valley Clinicians and nursing staff on multiple occasions between December 2003and March 2004. Plaintiff was treated through B-1 Clinic and his primary physicians numerous times, and admitted to Queen of the Valley Hospital on two occasions."

On April 14, 2004, plaintiff again complained to Dr. Al-Mufti about numbness and pain in his left hand. Dr. Al-Mufti told plaintiff these symptoms would disappear once he

started dialysis. Later that same day, Dr. Pai examined plaintiff's left hand. Dr. Pai expressed concern that plaintiff was not scheduled for surgery because the shunt was again obstructed and this was causing all the problems in plaintiff's left arm.

On March 20, 2004, plaintiff filed another administrative grievance regarding inadequate medical care. On April 28, 2004, this appeal was reviewed at the first level and partially granted. The interviewer found that plaintiff's left hand was severely swollen.

On April 29, 2004, plaintiff returned to QVH for an x-ray and to clear and check the blood flow through the shunt. Plaintiff was told that the procedure on the shunt could not be performed because his coumadin level was too high, which could cause uncontrolled bleeding.

On May 3, 2004, plaintiff was returned to QVH to have the procedure done that had been scheduled for April 29, 2004. An angioplasty was performed by inserting a catheter into the vein below the shunt site. On May 11, 2004, plaintiff awoke to find that the shunt was not properly working.

On May 12, 2004, plaintiff's ADA appeal was denied at the Director's Level. The response stated that the examiner had contacted the Medical Appeals Analyst at CMF to inquire as to plaintiff's medical care regarding the dialysis shunt. After summarizing plaintiff's medical treatment, the reviewer concluded that medical staff at CMF were providing plaintiff with regular treatment for his shunt and dialysis needs.

On May 14, 2004, plaintiff was admitted to QVH for a procedure to remove the blood clot obstructing his shunt.

On May 17, 2004, the administrative grievance originally filed by plaintiff on March 20, 2004, was reviewed at the second level of review by defendant MTA Kearny on behalf of defendant Khoury. Defendant Kearny denied the appeal, finding that everything was being done medically to diagnose and improve any problems with plaintiff's shunt.

On May 26, 2004, plaintiff again complained to Dr. Al-Mufti about swelling, numbness and pain in his left hand. Plaintiff also told Dr. Al-Mufti that his coumadin dosage

was too high, causing him to suffer spontaneous nose bleeds.

On June 17, 2004, plaintiff returned to QVH to have another angioplasty performed on the shunt. Because plaintiff had not been told about this procedure, he did not stop taking the coumadin. Consequently, the procedure could not be done.

On June 24, 2004, plaintiff returned to QVH for the angioplasty procedure. Following the procedure, the doctor gave plaintiff an instruction sheet for care of the procedure site. The instruction sheet was taken from plaintiff by the escorting correctional officers.

On June 30, 2004, plaintiff's left hand again became severely swollen, numb and painful.

On July 20, 2004, defendant Dr. Liou examined plaintiff. Plaintiff told defendant Liou about the problems he had with his shunt and left hand. Defendant Liou told plaintiff to keep his hand elevated at all times and sent plaintiff back to his housing unit with no further treatment.

On July 29, 2004, defendant Dr. Mehta examined plaintiff. Plaintiff's left hand was severely swollen and cold. Dr. Mehta told plaintiff that he could find nothing wrong.

On August 9, 2004, plaintiff's appeal, originally filed March 20, 2004, was denied at the Director's Level. The reviewer found that plaintiff had swelling in his hand and that plaintiff would be sent to QVH for an evaluation. The reviewer concluded that plaintiff was receiving adequate medical care.

On October 29, 2004, defendant Liou examined plaintiff. Plaintiff told defendant Liou that his left hand was swollen and painful. Defendant Liou stated that plaintiff needed to be on dialysis as soon as possible. After consulting with the dialysis unit, defendant Liou stated that plaintiff would see the dialysis doctor on November 15, 2004.

On November 5, 2004, defendant Lious again examined plaintiff. At this time, defendant Liou told plaintiff that he needed to begin dialysis immediately rather than waiting. Defendant Liou consulted with the dialysis unit, then told plaintiff that he would have to wait

until November 15, 2004, to begin dialysis.

On December 17, 2004, plaintiff was seen by Dr. Al-Mufti. Plaintiff again complained about his hand. Dr. Al-Mufti told him that these symptoms were normal.

On December 14, 2004, defendant Liou examined plaintiff. Plaintiff again complained about his left hand. Plaintiff, who had apparently obtained the post-operative instructions confiscated by prison staff, told defendant Liou that these instructions stated that the continuing problems with his hand were not normal. The instructions stated that, "normally arm swelling resolves over a period of time, sometimes up to a few weeks. This should, however, improve on a daily or weekly basis. If you notice that the swelling is becoming worse, please contact our office. It may mean that there is an obstruction to the venous flow further up your arm."

With respect to numbness, the instruction sheet stated, "occasionally you will experience coolness or slight numbness and even slight pain in the hand. This is due to 'steal' of blood by the fistula. If the numbness becomes worse, the coolness becomes more severe or particularly if pain becomes prominent, you should immediately call our office..."

After reviewing these instructions, defendant Liou told plaintiff not to worry because everything was normal.

On January 21, 2005, plaintiff received his first dialysis treatment.

On March 22, 2005, plaintiff returned to QVH to have a blood clot removed from the shunt. At the hospital, defendant Raymond asked plaintiff how long his hand had been "that way." Plaintiff told defendant Raymond that prison staff said his hand was normal. Defendant Raymond stated that he would write a note stating that plaintiff should return to QVH so something could be done about his hand.

In April 4, 2005, plaintiff returned to QVH to have an angioplasty done. However, the procedure could not be done because plaintiff had not been given notice to stop taking the coumadin.

On April 8, 2005, plaintiff determined that his shunt was not working. Later that day, plaintiff was taken to QVH to have the clot removed.

On April 9, 2005, plaintiff was taken to the CMF dialysis unit. The dialysis treatment could not be performed because of the swelling in plaintiff's arm. On April 11, 2005, plaintiff received dialysis.

On April 25, 2005, plaintiff determined that his shunt was not working. The medical dialysis staff told plaintiff that he would have to go to QVH. On April 26, 2005, plaintiff went to QVH to have the blood clot removed from his shunt. On April 29, 2005, plaintiff returned to QVH to map out plaintiff's right arm for a shunt. On May 16, 2005, plaintiff returned to QVH to have a blood clot removed from his left arm.

On May 18, 2005, as plaintiff was receiving dialysis, his left arm started to swell and feel painful. On May 20, 2005, while plaintiff was recovering from dialysis, his left arm got even bigger. Plaintiff was then examined by defendant Liou who stated that plaintiff needed to go to QVH.

On May 23, 2005, plaintiff went to QVH. Plaintiff's left arm and hand were badly swollen. After x-rays were performed, plaintiff returned to CMF.

On May 25, 2005, plaintiff could not receive dialysis because his arm was swollen. Dr. Al-Mufti wrote an order for plaintiff to be taken to QVH so that a catheter could be put in the shunt so that it could heal.

On May 27, 2005, plaintiff was taken to QVH in response to Dr. Al-Mufti's order. At QVH, defendant Raymond ordered an x-ray and sent plaintiff back to prison because the hospital did not have a bed.

On June 1, 2005, plaintiff received his first dialysis treatment in over 11 days. Because his arm was so swollen, there were problems with the dialysis.

/////

/////

III. Defendant Bien's Motion to Dismiss

*Legal Standard for Motion to Dismiss*

A complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that plaintiff cannot prove any set of facts consistent with his allegations which would entitle him to relief. NOW, Inc. v. Schiedler, 510 U.S. 249, 256, 114 S. Ct. 798, 803 (1994); Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984), citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101 (1957), Cervantes v. City of San Diego, 5 F.3d 1273, 1274-75 (9th Cir. 1993). Dismissal of the complaint, or any claim within it, "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990); see also Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

In considering a motion to dismiss, the court must accept as true the allegations of the complaint in question, Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740, 96 S. Ct. 1848, 1850 (1976), construe the pleading in the light most favorable to the party opposing the motion and resolve all doubts in the pleader's favor. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 1849, reh'g denied, 396 U.S. 869, 90 S. Ct. 35 (1969). The court will "'presume that general allegations embrace those specific facts that are necessary to support the claim.'" NOW, 510 U.S. at 256, 114 S. Ct. at 803, quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137 (1992). Moreover, pro se pleadings are held to a less stringent standard than those drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596 (1972).

The court may consider facts established by exhibits attached to the complaint. Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987). The court may also consider facts which may be judicially noticed, Mullis v. United States Bankruptcy Ct., 828 F.2d 1385, 1388 (9th Cir. 1987); and matters of public record, including pleadings, orders, and other papers filed with the court, Mack v. South Bay Beer Distributors, 798 F.2d 1279, 1282 (9th Cir.

1986). The court need not accept legal conclusions "cast in the form of factual allegations." Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

A pro se litigant is entitled to notice of the deficiencies in the complaint and an opportunity to amend, unless the complaint's deficiencies could not be cured by amendment. See Noll v. Carlson, 809 F. 2d 1446, 1448 (9th Cir. 1987).

*Legal Standard for Eighth Amendment Claim*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense––a subjective standard––disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing

Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." McGuckin, 974 F.2d at 1061.

*Analysis*

Defendant Bien moves for a more definite statement on grounds that the three causes of action raised in the amended complaint are unclear. In the first cause of action plaintiff alleges that defendants acted negligently in violation of his state and federal constitutional rights. In the second cause of action, plaintiff alleges that defendants' failure to treat his medical problems constituted cruel and unusual punishment. In the third cause of action, plaintiff alleges that defendants acted with deliberate indifference.

The court construes the second and third causes of action to be alleging a violation of plaintiff's Eighth Amendment right to adequate medical care. The court construes the first cause of action to be stating a state law claim for negligence. Because plaintiff's legal claims are clear, the motion for more definite statement is ordered denied.

Defendant Bien next moves to dismiss on grounds that he is not a state actor.

In order to state a claim under § 1983, a plaintiff must allege that: (1) defendant was acting under color of state law at the time the complained of act was committed; and (2) defendant's conduct deprived plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; see West v. Atkins, 487 U.S. 42, 48 (1988).

Citing Jackson v. East Bay Hospital, 980 F. Supp. 1341, 1356-1357 (N.D.Cal. 1997), defendant argues that private physicians in private hospitals are not state actors. In West

v. Atkins, 487 U.S. 42, 54 (1988), the Supreme Court held that a private medical doctor under contract with a state to provide medical services to inmates is a state actor for purposes of section 1983. The nature of defendant Bien's relationship with the Department of Corrections and/or CMF, if any, is not clear from the record. Accordingly, the court cannot find that defendant Bien is not a state actor. This argument is more appropriately raised in a summary judgment motion.

Defendant next argues that plaintiff has failed to state a colorable Eighth Amendment claim against him. The amended complaint contains two specific allegations against defendant Bien: on February 6, 2004, defendant Bien removed a clot from plaintiff's shunt, and on February 26, 2004, defendant Bien removed dark blood from plaintiff's arm.[1] Defendant Bien argues that these facts indicate that he believed that the problem would resolve following these procedures.

To put plaintiff's claims against defendant Bien in context, the court must consider what happened after February 26, 2004. Following plaintiff's return to CMF, he became very ill and it was determined that the shunt was severely infected. Plaintiff claims that on February 29, 2004, Dr. Altchek determined that the shunt was severely infected because it was swollen and draining black blood. On March 4, 2004, plaintiff had surgery to treat the infection.

No one would argue that plaintiff had and has a serious medical condition. The issue, as is most often the case, revolves about the adequacy of treatment. And, as is usually the case, plaintiff is seen by a myriad of doctors who point to their singular treatment(s) without regard to the total context, and claim, at least superficially reasonably, that treatment on this particular day could not possibly constitute deliberate indifference.

However, in its totality, the treatment regimen could be viewed as suspiciously lacking. Why was plaintiff not retained at Queen of Angels in order to assess why each treatment

---

[1] Defendant also states that plaintiff claims that defendant gave him the post-operative instruction sheet on June 24, 2004. After reviewing the amended complaint, the court does not find that plaintiff has linked defendant Bien to this allegation.

modality seemed to fail, or at least until the complications stabilized. One without medical expertise could argue that it seemed that plaintiff was regarded as a medical "pain" whose problems were band-aided over on each particular day with the knowledge that the band-aid would soon fail, but that plaintiff would then be someone else's problem, and so on, and so on etc.

Of course, the court is not finding at this time that such is true. However, the court cannot find at this time that such is not possible as a matter of law. Adjudication of the individual liabilities of defendants must be assessed after factual inquiry is made.

As for injunctive relief, plaintiff seeks an order directing defendants to stop delaying his medical care, to cease their reprisals and for an examination by a reputable vascular surgeon. Defendant Bien argues that plaintiff's request for injunctive relief should be dismissed because he has not pled a genuine threat of future injury. Defendant also states that he saw plaintiff twice in February 2004, and nothing in the amended complaint suggests a continuing relationship with plaintiff.

The amended complaint alleges ongoing violations of plaintiff's right to adequate medical care. Whether plaintiff's claim for injunctive relief against defendant Bien should be dismissed is an issue more appropriately raised in a summary judgment motion.

In conclusion, defendant Bien's motion to dismiss should be denied.

IV. Motion to Dismiss by Defendants Khoury, et al.

*Failure to Exhaust Administrative Remedies*

Defendants Khoury, et al. first move to dismiss on grounds that plaintiff failed to exhaust administrative remedies.

42 U.S.C. § 1997e(a) provides that, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." In order for California prisoners to exhaust administrative remedies, they must

proceed through several levels of appeal: 1) informal resolution, 2) formal written appeal on a CDC 602 inmate appeal form, 3) second level appeal to the institution head or designee, and 4) third level appeal to the Director of the California Department of Corrections. Barry v. Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997) (citing Cal. Code Regs. tit. 15, § 3084.5). A final decision from the Director's level of review satisfies the exhaustion requirement. Id. at 1237-38.

In Booth v. Churner, 121 S. Ct. 1819 (2001) the Supreme Court held that inmates must exhaust administrative remedies, regardless of the relief offered through administrative procedures. 121 S. Ct. at 1825. Therefore, inmates seeking money damages must completely exhaust their administrative remedies. 42 U.S.C. § 1997e(a) provides that no action shall be brought with respect to prison conditions *until* such administrative remedies as are available are exhausted. McKinney v. Carey, 311 F.3d 1198 (9th Cir. 2002).

Defendants argue that plaintiff's administrative appeals were filed before the alleged acts by defendants Liou and Mehta. Therefore, defendants contend, these appeals could not have exhausted the claims against these defendants. The amended complaint alleges that defendant Liou first examined plaintiff on July 20, 2004, and that defendant Mehta examined plaintiff on July 29, 2004. According to the amended complaint, plaintiff filed an ADA appeal on February 22, 2004, and an administrative appeal on March 20, 2004.

Plaintiff's appeals concerned his dialysis shunt and the related problems with his hands. Plaintiff's claims against defendants Liou and Mehta concern these same issues. These appeals were sufficient to put prison officials on notice as to the claims raised in the instant action. See Porter v. Nussle, 534 U.S. 516, 531, 122 S. Ct. 983 (2002) (emphasizing importance of providing prison officials with notice and opportunity to take action before prisoner files suit). Plaintiff is not required to file additional grievances regarding an ongoing violation. See Irvin v. Zamora, 161 F. Supp. 2d 1125 (S.D.Cal. 2001) (prisoner not required to name individual defendants in administrative appeals regarding ongoing deprivations of medical

accommodations).[2] Accordingly, the motion to dismiss the claims against defendants Liou and Mehta for plaintiff's failure to exhaust administrative remedies should be denied.

Defendants next observe that plaintiff's claims against defendants Kearny and Khoury are based on their review of his administrative appeals. Plaintiff alleges that on May 17, 2004, defendant Kearny reviewed plaintiff's administrative appeal on behalf of defendant Khoury. Defendants argue that plaintiff never made any acts by defendants Khoury and Kearny the subject of any alleged administrative appeal.

Defendants are arguing that plaintiff was required to file yet another round of administrative appeals challenging defendants' denial of his separate administrative grievance. This makes no sense. The claims against defendants Khoury and Kearny are exhausted.

Accordingly, for the reasons discussed above, the court recommends that the motion to dismiss on grounds that plaintiff failed to exhaust administrative remedies be denied.

*Failure to State a Claim*

Defendants argue that plaintiff has failed to state a colorable Eighth Amendment claim against defendants Kearny and Khoury because the only allegation is that these defendants reviewed plaintiff's administrative appeal at the first level of review.

Defendants sued in their individual capacity must be alleged to have: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or implemented a policy that repudiates constitutional rights and was the moving force behind the alleged violations. Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991); Hansen v. Black, 885 F.2d 642 (9th Cir. 1989); Taylor v. List, 880 F.2d 1040 (9th Cir. 1989). "Although a § 1983 claim has been described as 'a species of tort liability,' Imbler v.

---

[2] The court does not apply Irwin on a blanket basis, but views the circumstances of each case to determine whether CDC officials, having been advised of the specifics of plaintiff's problems, received sufficient notice to address plaintiff's problems as a whole. CDC officials received such notice here. Defendants attempts to incorporate the Federal Rules pleading practice into an administrative grievance procedure exalts form over substance.

Pachtman, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L.Ed.2d 128, it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." Martinez v. State of California, 444 U.S. 277, 285, 100 S. Ct. 553, 559 (1980). "Without proximate cause, there is no § 1983 liability." Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

> The search, which was performed in accordance with this constitutionally valid strip search policy, was subsequently ratified by the School Board when Mr. Williams filed a grievance. Therefore, Williams' only grasp at evoking municipal liability under § 1983 is to show that this subsequent ratification is sufficient to establish the necessary causation requirements. Based on the facts, the Board believed Ellington and his colleagues were justified in conducting the search of Williams. There was no history that the policy had been repeatedly or even sporadically misapplied by school board officials in the past. Consequently, the School Board cannot be held liable for the ratification of the search in question, because this single, isolated decision can hardly constitute the "moving force" behind the alleged constitutional deprivation.

Williams v. Ellington, 936 F.2d 881, 884-885 (9th Cir. 1991).

This court is unwilling to adopt a rule that anyone involved in adjudicating grievances after the fact is per se potentially liable under a ratification theory. However, this is not to say that persons involved in adjudicating administrative disputes, or persons to whom complaints are sometimes made, can never be liable under a ratification theory. If, for example, a reviewing official's rejections of administrative grievances can be construed as an automatic whitewash, which may have led other prison officials to have no concern of ever being reprimanded, a ratifying official may be liable for having put a defective policy in place.

Defendant Kearny denied plaintiff's appeal on behalf of defendant Khoury after finding that everything was being done medically to diagnose and improve the problems with plaintiff's shunt. The court does not find that defendant Kearny's conduct constituted an automatic whitewash which would have led other prison officials to have no concern that they would ever be reprimanded, for example. Accordingly, the court finds that plaintiff's Eighth Amendment claims against defendants Kearny and Khoury should be dismissed.

\\\\\

Defendants also argue that plaintiff has failed to state colorable Eighth Amendment claims against defendants Mehta and Liou. The only allegation against defendant Mehta is that he examined plaintiff on July 29, 2004. At that time, plaintiff's left hand was severely swollen and cold. Defendant Mehta told plaintiff that he could find nothing wrong.

Defendant Mehta examined plaintiff approximately one month after the angioplasty surgery. According to the post-surgery instruction sheet, the continued swelling of plaintiff's hand at this time indicated that the shunt was blocked. Also according to the post-surgery instruction sheet, the coolness of plaintiff's hand indicated that something serious was wrong. Defendant Mehta's statement that nothing was wrong was contradicted by the post-surgery instruction sheet. Construing plaintiff's amended complaint in the light most favorable to plaintiff, and resolving all doubts in plaintiff's favor, the court finds that defendant Mehta's failure to treat plaintiff's hands on July 29, 2004, states a colorable Eighth Amendment claim.

The court will summarize plaintiff's claims against defendant Liou. Plaintiff alleges that on July 20, 2004, he told defendant Liou about the problems with his hand: severe swelling, numb and painful. Defendant Liou told him to keep his hand elevated. Plaintiff next claims that on October 29, 2004, he again told defendant Liou that his hand was swollen and painful. Defendant told plaintiff that he would need to start dialysis soon. On November 5, 2004, defendant Liou told plaintiff that he would need to start dialysis immediately. Defendant Liou then told plaintiff that he would have to wait to begin dialysis until November 15, 2004. On December 14, 2004, plaintiff again complained to defendant Liou about his hand. Defendant Liou told him that nothing was wrong. On May 20, 2005, defendant Liou examined plaintiff and told him that he would have to go to QVC.

For the reasons expressed earlier, defendants' motion is premature.

*Qualified Immunity*

Defendants argue that they are entitled to qualified immunity. The court will consider qualified immunity as to defendants Liou and Mehta only, as the claims against

defendants Kearny and Khoury should be dismissed on the merits.

The determination of whether a prison official is entitled to qualified immunity is a two-step test. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001). In the first step, the court views the record in the light most favorable to the party asserting injury to determine whether the officer's conduct violated a constitutional right. Id. If the plaintiff establishes the violation of a constitutional right, the court next considers whether that right was clearly established at the time the alleged violation occurred. Id. The contours of the right must have been clear enough that a reasonable officer would have understood that what he was doing violated that right. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).

For the reasons discussed above, the court finds that plaintiff has stated colorable Eighth Amendment claims against defendants Mehta and Liou regarding the treatment of his left hand. Plaintiff's Eighth Amendment right to adequate medical care was clearly established. The final consideration in the qualified immunity analysis is whether a reasonable prison official would have believed that failing to provide further treatment for plaintiff's hand violated plaintiff's constitutional rights.

V. Defendant Raymond's Motion to Dismiss

Defendant Raymond argues that plaintiff has failed to state a colorable Eighth Amendment claim against him. The court will summarize the claims contained in the amended complaint against defendant Raymond.

Plaintiff alleges that on December 19, 2003, defendant Raymond removed an obstructed blood clot from the shunt. Plaintiff alleges that on March 22, 2005, he was sent to QVH to have a blood clot removed from the shunt. At the hospital, defendant Raymond asked plaintiff how long his hand had been "that way." Defendant Raymond told plaintiff that he would write a note stating that plaintiff should return to QVH so something could be done about his hand.

\\\\\

Plaintiff's claim that on December 19, 2003, defendant Raymond removed an obstructed blood clot does not state a colorable Eighth Amendment claim. The removal of the clot does not suggest a claim for deliberate indifference. Standing alone, the claim that on March 22, 2005, defendant Raymond told him that he would write a note stating that plaintiff should return to QVH for treatment of his hand also does not suggest deliberate indifference. Because no other allegations are made regarding defendant's representation that he would write this note, and it does not appear that factual development could aid plaintiff, this claim should be dismissed.

Finally, plaintiff alleges that On May 25, 2005, Dr. Al-Mufti wrote an order for plaintiff to be taken to QVH so that a catheter could be put in the shunt so it could heal. On May 27, 2005, plaintiff was taken to QVH in response to this order. At QVH, defendant Raymond ordered an x-ray and send plaintiff back to CMF because the hospital did not have a bed. Adjudication of this motion is premature.

IT IS HEREBY ORDERED that the Motion for More Definite Statement is DENIED;

IT IS HEREBY RECOMMENDED that:

1. Defendant Bien's December 22, 2005, motion to dismiss be denied;

2. The motion to dismiss filed December 27, 2005, be granted as to defendants Khoury and Kearny, and denial as to all claims against defendant Liou; the motion to dismiss be denied as to defendants Mehta and Liou regarding the claims concerning their treatment of plaintiff's left hand;

3. Defendant Raymond's January 19, 2006, motion to dismiss be denied insofar as the catheter insertion claim, but granted insofar as removal of the blood clot is concerned.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 4/18/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
all547.mtd